# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1309
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Zachery T. Whitehill, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 07-1311
_____

| | | |
|---|---|---|
| United States of America, | * | Appeals from the United States |
| | * | District Court for the Western |
| Plaintiff - Appellee, | * | District of Missouri. |
| | * | |
| v. | * | |
| | * | |
| Bradley L. Lovstad, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

No. 07-1312
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |

v.                              *
                                *
Monty E. Wanless,               *
                                *
          Defendant - Appellant. *
_____

No. 07-1318
_____

United States of America,       *
                                *
          Plaintiff - Appellee,  *
                                *
     v.                         *
                                *
Jaime E. Cook,                  *
                                *
          Defendant - Appellant. *
_____

Submitted: October 18, 2007
Filed: July 10, 2008
_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.
_____

BYE, Circuit Judge.

     These appeals arise out of a telemarketing scheme to defraud would-be credit card purchasers. Zachary Whitehill, Bradley Lovstad, Monty Wanless, and Jaime Cook were charged with conspiracy to commit Wire and Telemarketing Fraud, 18 U.S.C. § 371, and Aiding and Abetting Wire and Telemarketing Fraud, 18 U.S.C. §§ 1343, 2325, and 2. In addition, Whitehill was charged with Aiding and Abetting Money Laundering, 18 U.S.C. §§ 1957 and 2, and Criminal Forfeiture, 18 U.S.C.

§ 982. Following a jury trial, Whitehill, Lovstad and Wanless were convicted of conspiracy and aiding and abetting, while Cook was convicted of conspiracy but acquitted of aiding and abetting. Whitehill was also convicted of money laundering and forfeiture.

Each defendant appeals his convictions and sentences arguing the district court[1] erred by 1) instructing the jury on willful blindness, 2) refusing defendants' theory of defense instruction, 3) imposing sentencing enhancements based on a preponderance of the evidence standard, and 4) refusing to grant a new trial based on the government's failure to disclose exculpatory materials in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). We affirm.

I

The scheme began in 1997 when Christopher Ekeland and Whitehill, among others, started Gecko, a telemarketing company. Lovstad, Wanless, and Cook were hired shortly after the company was formed. Initially, Gecko conducted telemarketing on behalf of charitable organizations. From the beginning, it engaged in questionable business practices. Its employees would solicit contributions from customers who were told the charities were local organizations and eighty percent of the contributions would go to the charity. In reality, the charities were not local and eighty to ninety percent of the contributions went to Gecko.

In August 1999, Gecko moved from charitable telemarketing to working with vendors who sold credit card packages. The vendors assembled offers which included coupons for free merchandise, travel, and applications for major credit cards. Most, if not all, of the materials were available to customers free of charge. Nonetheless, the

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

vendors hired telemarketing firms like Gecko to solicit customers at costs ranging between $159.95-$229.95. The vendors supplied Gecko with scripts its telemarketers followed to entice customers into purchasing the packages. The scripts directed telemarketers to tell customers the packages contained actual credit cards, not simply applications for credit cards. The vendors also sold call lists of potential customers to Gecko. The call lists contained the names of people who, because of poor creditworthiness, were unable to obtain unsecured credit cards.

Persons solicited were told 1) Gecko's telemarketer was an employee of the vendor, 2) the customer was pre-approved for a major credit card, 3) the customer's credit had been upgraded, and 4) the caller's company helped people reestablish creditworthiness. Frequently, telemarketers misrepresented their locations to customers to ease concerns about the legitimacy of the solicitations. The evidence showed the defendants were aware the statements were false.

If a customer agreed to purchase a credit card package, the telemarketer connected the customer to a "verification officer." The verification officer's job was to obtain billing information and confirm the purchase. Because verification calls were recorded, the verification officers did not follow the script provided to telemarketers. They told customers the packages did not contain actual credit cards and if the customer questioned the discrepancy an answer was selected from a list of prescribed responses termed a "rebuttal." For example, customers would be told all they had to do was provide the credit card company with their social security number and the card would be issued. The rebuttal response sheets were created by Gecko as a means of deflecting customer questions and complaints. The evidence showed the defendants knew the rebuttals were intended to facilitate sales and conceal misrepresentations.

The evidence showed each defendant was aware 1) the sales scripts falsely promised credit cards, 2) the verification process only promised applications, and 3)

the rebuttals were used to further the deception if a customer asked about the discrepancy. The government presented evidence of an email from Ekeland to Whitehill, Wanless, and Cook, sent weeks before the FBI raided Gecko's offices, directing them to conceal and later destroy the deceptive sales scripts. The government also presented evidence indicating the defendants were familiar with the materials contained in the packages, knew the packages did not contain credit cards as promised, and were aware credit-challenged customers, who could not obtain major credit cards, were being targeted. The government's evidence further demonstrated the defendants knew no customers ever received credit cards and Gecko periodically changed vendor names to solicit customers who previously had been duped. When the customers questioned the caller, they were told the telemarketer represented a different company and this time a card would be provided. Finally, several Gecko telemarketers testified they approached defendants questioning the legality of Gecko's activities but their concerns were dismissed. At trial, the defendants denied knowledge of the fraudulent scheme. The government argued the evidence proved defendants had actual knowledge of the scheme or were suspicious but chose to focus on generating revenue instead of pursuing their concerns.

Gecko established offices in Iowa, Missouri, and Kansas, and solicited customers throughout the United States. Whitehill was Gecko's co-owner, vice-president, secretary, and an office manager. He established a second business for the purpose of purchasing call lists of credit-challenged customers, supervised Gecko's Iowa offices, hired and trained telemarketers and managers, maintained and "tweaked" sales scripts, and prepared sales reports and payroll.

Cook was hired in 1997 and became the manager at Gecko's office in Des Moines, Iowa. As manager he was responsible for hiring, training telemarketers, maintaining and modifying the sales scripts, processing customer leads, and other administrative duties. The evidence showed the Des Moines office generated approximately $455,223 in revenue while Cook was manager.

Lovstad was also hired in 1997 and became the manager of Gecko's Brooklyn, Iowa office. He was responsible for hiring, training telemarketers, maintaining and modifying the sales scripts, processing customer leads, and other administrative duties. The evidence showed the Brooklyn office generated approximately $1,120,718 in revenue while Lovstad was manager.

Wanless was hired in 1997 and in 1999 became the manager of Gecko's Kansas City, Kansas office. He was responsible for hiring, training telemarketers, maintaining and modifying the sales scripts, processing customer leads, and other administrative duties. The evidence showed the Kansas City office generated approximately $3,336,833 in revenue while Wanless was manager.

II

A. Jury Instructions - Willful Blindness

Defendants first argue there was no evidentiary basis for a willful blindness jury instruction and the instruction improperly reduced the government's burden of proof. We review the district court's jury instructions for abuse of discretion and will affirm "[i]f the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." United States v. Lalley, 257 F.3d 751, 755 (8th Cir. 2001). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993) (citations omitted). Ignorance is deliberate if the defendants were presented with facts putting them on notice criminal activity was particularly likely and yet intentionally failed to investigate. United States v. Barnhart, 979 F.2d 647, 652 (8th Cir. 1992). We look to whether there was sufficient evidence to justify the instruction, reviewing "the evidence and any reasonable inference from that evidence in the light most favorable to the government." United States v. Hiland, 909 F.2d 1114, 1130-31 (8th Cir. 1990).

A willful blindness instruction is not appropriate if the evidence implies defendants could only have had "either actual knowledge or no knowledge of the facts in question." United States v. Parker, 364 F.3d 934, 946 (8th Cir. 2004) (citation omitted). The evidence is sufficient to support the instruction if a jury could find beyond a reasonable doubt the defendants had either actual knowledge of the illegal activity or deliberately failed to inquire about it before taking action to support the activity. Id. (citing United States v. Kellermann, 992 F.2d 177, 179 (8th Cir. 1993)). If reasonable inferences support a finding the failure to investigate is equivalent to "burying one's head in the sand," the jury may consider willful blindness as a basis for knowledge. Gruenberg, 989 F.2d at 974.

The defendants argued they were unaware Gecko was engaged in fraud. Based on the foregoing, however, we find a jury could reasonably conclude defendants knew something was wrong but chose not to inquire.

The defendants' also claim the instruction lowered the government's burden of proof and allowed the jury to convict them based on a negligence standard. We have held a jury cannot be led to convict a defendant improperly on a negligence standard where, as here, the instruction states the jury must not conclude the defendant had knowledge of criminal activity if he was simply careless or negligent. See Parker, 364 F.3d at 947 n.3. Accordingly, we conclude the district court did not abuse its discretion in giving the willful blindness instruction.

B.    Jury Instructions - Theory of Defense

Defendants asserted a good faith defense, arguing they lacked intent to commit wire fraud and requested the jury be told: "In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another." The district court refused the instruction in favor of the Eighth Circuit Model Instruction on good faith which provides:

-7-

Good faith is a complete defense to the charge of conspiracy to commit telemarketing wire fraud [and aiding and abetting wire and telemarketing fraud] if it is inconsistent with knowledge of the purpose of the agreement to engage in telemarketing wire fraud [or intent to defraud which are essential elements of the charge of aiding and abetting telemarketing wire fraud.]

According to the defendants, the district court's refusal to use their instruction hampered the defense because the court's instructions did not "focus" the jury's attention on their asserted defense.

Defendants are entitled to a theory of defense instruction if it is timely requested, is supported by the evidence, and is a correct statement of the law, but they are not entitled to a particularly worded instruction. United States v. Lucht, 18 F.3d 541, 553 (8th Cir. 1994) (citing United States v. Long, 977 F.2d 1264, 1272 (8th Cir. 1992)). The district court has considerable discretion in framing the instructions and "[i]t is sufficient if the instruction actually given by the trial court adequately and correctly covers the substance of the requested instruction." United States v. Rederth, 872 F.2d 255, 258 (8th Cir. 1989) (quoting United States v. Richmond, 700 F.2d 1183, 1195-96 (8th Cir. 1983)). We determine the adequacy of instructions by looking at them as a whole and in the context of the trial. Id.

We see no basis for concluding the district court's good faith instruction was inadequate. It clearly defined good faith and stated it was a complete defense to the charges. The language requested by defendants shed no further light on the good faith defense, except to repeat the definition of fraudulent intent which was included elsewhere in the instructions. Therefore, the district court did not abuse its discretion.

C.    Brady Violation

Several weeks after trial, the government provided the defendants with a letter written by Ekeland's lawyer to the government which had not been disclosed before trial. The letter indicated the lawyer believed his client was of the view there was no evidentiary basis for charging Lovstad, Wanless, and Cook with fraud. The defendants viewed the letter as exculpatory and argued the government violated Brady by failing to disclose the information. The government argued there was no Brady violation because the lawyer's impressions were erroneous and Ekeland specifically disavowed his lawyer's statements.

Under Brady, the government must disclose any evidence both "favorable to an accused" and "material either to guilt or to punishment." 373 U.S. at 87. Brady applies to exculpatory and impeachment evidence, United States v. Bagley, 473 U.S. 667, 676 (1985), whether or not the accused has specifically requested the information, Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). Evidence favorable to the accused is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 433-34 (quoting Bagley, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Id. at 434.

The letter was written by Ekeland's lawyer and did contain opinions Ekeland refuted. Thus, it could not have been used to impeach Ekeland and there was no duty under Brady to disclose the letter. Even assuming it was Brady material, Ekeland's contrary testimony and the evidence marshaled by the government vitiates any harm occasioned by the nondisclosure. In this instance, the failure to produce a letter

containing a third-party's interpretation of a government witness's testimony does not undermine confidence in the verdict.

D.    Sentencing Enhancements

Defendants' final argument is the district court erred when it imposed various sentencing enhancements based on a preponderance of the evidence standard instead of requiring the jury to find the enhancements were supported by proof beyond a reasonable doubt.  This argument has previously been rejected by our court.  <u>See, e.g.</u>, <u>United States v. Okai</u>, 454 F.3d 848, 851-52 (8th Cir. 2006).

## III

The judgment of the district court is affirmed.

_____