# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3134

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas. |
| | * | |
| Alvin Clay, | * | [PUBLISHED] |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: April 16, 2010
Filed: August 27, 2010

_____

Before LOKEN, BRIGHT, and MELLOY, Circuit Judges.

_____

PER CURIAM.

A jury convicted Alvin Clay of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and four counts of money laundering in violation of 18 U.S.C. § 1957. The district court[1] sentenced him to five months' imprisonment and ordered him to pay $16,265.26 in restitution. Clay appeals, challenging the sufficiency of the evidence to support his convictions. He also argues the district court erred: (1) by denying his motion for a new trial; (2) in its jury instructions; (3) in admitting

_____

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

evidence; (4) in excluding evidence; and (5) in denying his motion to suppress. We affirm the judgment of the district court.

## I.  Background[2]

This case concerns a conspiracy to defraud purchasers of five homes in Little Rock, Arkansas.  The government charged three individuals for their roles in the conspiracy:  Clay, Raymond Nealy, and Donny McCuien (collectively referred to as "the conspirators").  During the period of the conspiracy, Clay worked as a licensed attorney in the State of Arkansas and also held a real estate and contractor's license.  Nealy worked as a mortgage broker and owned a mortgage company.  McCuien managed a Burger King and owned a property management and construction corporation.

Each of the five fraudulent home purchases proceeded in a similar manner.  Usually McCuien would find a purchaser for an inexpensive residential property.  The purchaser would be promised a no-risk transaction, wherein he or she would receive some cash from closing.  Nealy would then obtain financing in an amount substantially greater than the asking price.  Using fraudulent information and frequently forging signatures, he would arrange for appraisals of the homes and prepare contracts for sale.  The contracts showed a sale price greater than the asking price.  The difference between the asking price and sale price would go to Clay Construction Company for the renovation of the property.

At closing, the conspirators would fax a Clay Construction invoice to the closing agent, even though the work claimed on the invoice had not been completed.  The invoice showed a difference between the amount loaned to the borrower and the

---

[2]"We recite the facts in the light most favorable to the jury's verdicts."  *White v. McKinley*, 605 F.3d 525, 528 (8th Cir. 2010) (quoting *United States v. Hayes*, 574 F.3d 460, 465 (8th Cir. 2009)).

amount paid to the seller. The closing agent would send Clay Construction Company a check for the invoice amount. In total, the conspirators submitted five invoices to title companies, and title companies subsequently issued five checks to Clay Construction totaling $133,142.23. Clay received the checks, deposited them into Clay Construction's bank account, and divided the money among Nealy, McCuien, and himself. The conspirators did not complete any work on any of the homes.

The FBI learned of this scheme when Kenny Wright, a tax preparer, became concerned that he had unlawfully assisted the conspirators with preparing false documents. Wright, accompanied by his attorney, approached the government, admitting that he had falsified tax documents and participated in the fraudulent scheme by preparing false construction invoices. Wright provided the FBI with the conspirators' names, the names of the conspirators' businesses, Clay's social security number, and documentation of the illegal activity.

FBI agents subsequently executed a search warrant for Clay's law office and Nealy's mortgage company, seizing twenty boxes of documents and seven computers. As a result of the search, the government sought a federal grand jury indictment.

The grand jury returned an indictment in December 2004, a first superseding indictment in November 2005, and a second superseding indictment in June 2007. The second superseding indictment alleged that Nealy and McCuien solicited individuals to purchase five homes and used fraudulent documentation when applying for financing through Nealy's mortgage company. According to the indictment, the conspirators caused false offers to purchase and false invoices to be delivered to the title companies. The invoices claimed that work had been completed on the homes, even though no work had been done. It also alleged that Nealy and Clay had defrauded the purchasers of the five homes.[3]

---

[3]The second superseding indictment only named Clay and Nealy as defendants. McCuien pled guilty before the return of the second superseding indictment.

Before trial, Clay moved to suppress evidence seized in the search of his office and to dismiss the indictment on the grounds that it failed to state an offense and was the product of prosecutorial retaliation. In support of his retaliation claim, Clay alleged he had been involved in a contentious litigation with the same prosecutor who initiated the criminal investigation of Clay. After Clay filed these motions, the Western District of Arkansas assumed responsibility for the Eastern District of Arkansas's case. Following a hearing, the district court denied Clay's motions.

The government tried Clay separately from Nealy. More than thirty witnesses testified during the seven-day trial. The court denied Clay's motions for judgment of acquittal at the close of the government's case-in-chief and at the close of the trial. After the jury returned a guilty verdict, Clay moved for a judgment of acquittal and for a new trial. The district court held a hearing on these motions. At the hearing, Clay argued that McCuien had perjured himself at trial. The district court denied both motions. Clay appeals his convictions.

## II. Sufficiency of the Evidence

Clay argues the government failed to introduce sufficient evidence to support the conviction for conspiracy to commit wire fraud.

This court reviews sufficiency of the evidence de novo and reverses only if no reasonable jury could have found the defendant guilty. *United States v. Elzahabi*, 557 F.3d 879, 885 (8th Cir. 2009). "Evidence is sufficient to sustain a conviction if, when viewed in the light most favorable to the government, it offers substantial support for the verdict." *United States v. Slaughter*, 128 F.3d 623, 627 (8th Cir. 1997). "It is axiomatic that we do not pass upon the credibility of witnesses or the weight to be given their testimony." *Id.* (citations and quotations omitted).

McCuien was named as a coconspirator, along with other persons known and unknown to the grand jury.

To convict Clay of conspiracy to commit wire fraud, the government needed to prove: "(1) a conspiracy with an illegal purpose existed; (2) [Clay] knew of the conspiracy; and (3) [Clay] knowingly joined and participated in the conspiracy." *United States v. Price*, 542 F.3d 617, 620 (8th Cir. 2008).

Clay raises two arguments. We address each in turn.

A.

Clay first argues he did not participate in the delivery, nor did he know about the fraudulent documents Nealy and McCuien sent to lenders and title companies. Clay maintains that he was only connected to the lenders through the Clay Construction invoices which he contends were immaterial to the lenders' decisions to loan money to the purchasers. Therefore, he argues, no loan proceeds were transmitted by wire communications as a result of his involvement.

We disagree with Clay that he needed to be directly involved in the transmission of loan proceeds from the lenders to the title companies. To be guilty of a conspiracy, he need not have knowledge of every detail of the conspiracy. Rather, the government needed to establish that the participants agreed to the essential nature of the conspiracy. *See Slaughter*, 128 F.3d at 628 (requiring that the government prove that the defendant knew the essential object of the conspiracy).

The government introduced evidence that Clay received $27,500 as a result of his partnership with McCuien and Nealy, yet he did not complete any work on any of the homes. Clay admitted at trial that he listed himself as the "supervisor" of a construction project on one of the Clay Construction invoices that the conspirators sent to a title company even though he was not present on any job sites, nor did he supervise any subcontractors or workers. The evidence further established that the title companies relied on these invoices to send a check to Clay Construction for the

-5-

difference between the amount loaned to the borrower and the amount paid to the seller, and Clay admitted that he bore responsibility for the invoices. Clay then deposited the checks from the title companies into his Clay Construction Company checking account and immediately wrote checks to himself, Nealy, and McCuien.

Clay may not have known every detail of the conspiracy. But the law does not require such knowledge. *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947) ("[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."). The evidence, taken in the light most favorable to the verdict, showed that Clay intended to assist McCuien and Nealy with defrauding others out of money, he knew the essential object of the conspiracy, and that it was reasonably foreseeable that interstate wire communications would be used. *See Slaughter*, 128 F.3d at 627 (providing for the insufficiency of the evidence standard). We reject Clay's sufficiency of the evidence claim.

B.

Clay next argues that the government failed to prove he conspired to commit wire fraud because the government only proved that he defrauded the purchasers. He asserts that the purchasers were not victims because they knowingly participated in the fraud by falsely representing their intention to live in the homes they were purchasing and provided false information about their finances.

But the purchasers' testimony negates Clay's claim. The purchasers testified that they purchased the homes because McCuien told them they could make money in real estate and that several of them were harmed by the conspiracy. Further, McCuien admitted that the purchasers were never informed that the conspirators received money from the title companies and that they split the money amongst

themselves. McCuien testified that they did not tell the purchasers because they wanted to keep the money for themselves. We conclude that the testimony supports the jury's verdict that McCuien, Nealy, and Clay engaged in a conspiracy to defraud the purchasers and that the purchasers were harmed by the conspiracy.

Finally, Clay provides no authority for his proposition that the purchasers could not be the victim of a conspiracy to commit wire fraud. The substantive statute for wire fraud, 18 U.S.C. § 1343, does not specify who must be the victim of the wire fraud. The statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The government charged Clay with conspiracy to commit wire fraud, and the second superseding indictment clearly states that the conspirators engaged in a scheme to defraud the purchasers of the homes. Because Clay has not established he must defraud a lender to be found guilty of the conspiracy, and the evidence clearly establishes that purchasers suffered harm as a result of the conspiracy, we reject Clay's argument and affirm the conviction for conspiracy to commit wire fraud.[4]

---

[4]Clay argues in a footnote that this court should set aside the money laundering convictions on insufficient evidence grounds, but he does not explain what elements the government failed to prove. We have carefully reviewed the record and are satisfied that the government proved that Clay knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and that the property was derived from unlawful activity. *See* 18 U.S.C. § 1957.

## III. Motion for a New Trial

Clay argues the district court erred in denying his motion for a new trial because McCuien testified against him and McCuien lacked credibility. At trial, McCuien testified he had no experience in construction. After trial, Clay presented the court evidence that McCuien actively participated in construction and home repair.

But Clay's post-trial attack on McCuien's credibility merely amounts to impeachment evidence. "[N]ewly discovered evidence which is merely impeaching normally cannot form the basis for a new trial." *United States v. Bonadonna*, 775 F.2d 949, 957 (8th Cir. 1985). Further, the district court determined that a jury could infer that Clay participated in the conspiracy based on reasons unrelated to McCuien's testimony: (1) Clay had complete control over the $133,142 he deposited into the Clay Construction account; (2) the manner in which the conspirators distributed the proceeds indicated that no work had been done on the five houses; and (3) none of the indicia of a legitimate construction project were present. We conclude the district court did not abuse its discretion in denying Clay's motion for a new trial. *See United States v. Huerta-Orozco*, 272 F.3d 561, 566 (8th Cir. 2001).

## IV. Jury Instruction

The district court instructed the jury on whether Clay acted knowingly:

> You may find that Alvin Clay acted knowingly if you find beyond a reasonable doubt that Alvin Clay was aware of a high probability that money or property was being obtained under false or fraudulent pretenses and that he deliberately avoided learning the truth. The element of knowledge may be inferred if Alvin Clay deliberately closed his eyes to what would otherwise have been obvious to him. You may not find Alvin Clay acted "knowingly" if you find he was merely negligent, careless, or mistaken as to whether money or property was being obtained under false or fraudulent pretenses.

You may not find that Alvin Clay acted knowingly if you find that he actually believed that money or property was not being obtained under false or fraudulent purposes.

Clay argues this instruction requires reversal for two reasons.[5]

## A. Reasonable Doubt

First, Clay contends the instruction undermined the reasonable doubt standard, because the use of the phrase "aware by a high probability" misled the jury on the definition of "reasonable doubt."

The term reasonable doubt "defies easy explication." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). The Supreme Court explained:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

*Id.* (citations omitted).

We conclude Clay failed to establish that the district court abused its discretion in instructing the jury on the reasonable doubt standard as it pertained to whether Clay acted knowingly. *See United States v. Rehak*, 589 F.3d 965, 972 (8th Cir. 2009) (providing for an abuse of discretion standard of review). This instruction did not

---

[5]Clay also briefly argues this instruction shifted the burden of proof. We find no merit to this argument.

merely require that the jury find a "high probability" that Clay committed the offenses. Rather, the instruction stated that the jury must find beyond a reasonable doubt "that Alvin Clay was aware of a high probability" that money was being fraudulently obtained.

Moreover, the district court instructed the jury on the reasonable doubt standard in Jury Instruction #5:

> A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

Clay does not argue the district court erred in its reasonable doubt instruction, nor can we discern any mistake in law on this instruction. Further, Clay has not established that there is a reasonable likelihood that the jury applied the instruction in an unconstitutional manner. *See Victor*, 511 U.S. at 6 ("The constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on [insufficient proof]."). We conclude that the jury instructions, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury. *See id.* at 5.

## B. Willful Blindness Instruction

Clay next argues that the district court erroneously instructed the jury that it could infer knowledge of the conspiracy if it found Clay "deliberately closed his eyes to what would otherwise have been obvious to him." He maintains this willful blindness instruction undermined the requirement for knowledge and intent.

-10-

"A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." *United States v. Gruenberg*, 989 F.2d 971, 974 (8th Cir. 1993) (citation and quotations omitted). "Ignorance is deliberate if the defendants were presented with facts putting them on notice criminal activity was particularly likely and yet intentionally failed to investigate." *United States v. Whitehill*, 532 F.3d 746, 751 (8th Cir. 2008). Evidence is sufficient to support such an instruction "if a jury could find beyond a reasonable doubt the defendants had either actual knowledge of the illegal activity or deliberately failed to inquire about it before taking action to support the activity." *Id.* "If reasonable inferences support a finding the failure to investigate is equivalent to 'burying one's head in the sand,' the jury may consider willful blindness as a basis for knowledge." *Id.* (quoting *Gruenberg*, 989 F.2d at 974).

Here, the district court deemed such an instruction appropriate, reasoning:

> There were at least two invoices that were shown to Mr. Clay where they said supervised by Alvin Clay, and he admitted he had those contemporaneously with getting paid and he knows that he didn't supervise any work and did not inquire about any of that. And so that's evidence of some misrepresentation and deliberately looking away.
> 
> The other thing that -- the other part of the evidence that bothered -- that made me think this might be an appropriate instruction had to do with the first transaction with Linda Jones in which Clay Construction Company got whatever the amount of the check was, I don't remember, and then got three cashier's checks for Ray Nealy's mother and to have that request of a general contractor from a subcontractor, don't pay me, don't pay my materialmen, don't pay my laborers, you know, write out three cashier's checks for my mother, that's the sort of thing that not inquiring about that seems to me evidence that would support giving that instruction.

Trial Tr. 1095-96.

-11-

Based on these facts, we agree with the district court that a jury could reasonably conclude that Clay either knew of the illegal activity or buried his head in the sand. Therefore, the court did not abuse its discretion in providing a willful blindness instruction.[6]

## V. Admission of Evidence

Clay argues the district court erred by admitting evidence that he had engaged in fraud when securing his contractor's license. He complains that the district court should not have permitted testimony from four witnesses who testified about the manner in which Clay obtained his contractor's license because it violated Federal Rule of Evidence 404(b).

Gregory Crow, the administrator of the Arkansas Contractors Licensing Board, testified that Clay applied for a contractor's license in 2001. Crow testified that the application required that Clay submit references from individuals for whom he had completed work. Clay's application listed Pat Joyner, Earl Jones, and Allan Nelson as references and included each of their alleged signatures. Crow testified that Clay swore on his application that his answers were true. Crow further testified that the

---

[6]Clay also briefly argues that his convictions for money laundering should be set aside because the jury instructions misstated an element of the money laundering offense. He relies on *United States v. Santos*, 128 S. Ct. 2020 (2008) (plurality opinion), which the Supreme Court decided on the fifth day of his trial. The Court in *Santos* determined ambiguous the term "proceeds," as used in 18 U.S.C. § 1956, and that "proceeds" should be defined as "profits." *Id.* at 2024-25.

Clay asserts that the district court should have instructed the jury that the term "proceeds" meant "profits." Because Clay did not request this instruction, we review his claim for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). Clay has not established that the error, if any, affected the outcome of the proceedings. It seems unlikely that this definition affected the verdict because Clay's defense was not that he did not "profit" at least $10,000. Rather, Clay defended the charges by arguing that he did not knowingly participate in the money laundering scheme.

Licensing Board would not have issued Clay a contractor's license if he included false information on his application.

Three other witnesses testified briefly that they were listed as references for Clay's application although Clay did not perform work on their homes. Pat Joyner testified that Clay never engaged in any contracting work for her, she did not fill out a reference form for him, and she did not remember signing a reference form. Earl Jones testified that he did not sign Clay's reference form, did not authorize anyone to submit the reference form on his behalf, and did not know of Clay's experience in construction. Allan Nelson similarly testified.

Federal Rule of Evidence 404(b) provides that evidence of crimes by the defendant which are not charged in the indictment are generally inadmissible. *See United States v. Clemons*, 503 F.2d 486, 489 (8th Cir. 1974). "However, evidence of other crimes is admissible for the purpose of providing the context in which the crime occurred." *United States v. Forcelle*, 86 F.3d 838, 841 (8th Cir. 1996). As further explained in *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir. 1986) (citations omitted):

> We have held that where evidence of other crimes is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged," it is admissible as an integral part of the immediate context of the crime charged. When the other crimes evidence is so integrated, it is not extrinsic and therefore is not governed by Rule 404(b).

The government argues the district court correctly admitted the evidence because the manner in which Clay obtained his contractor's license was intrinsic evidence of the fraudulent scheme upon which the wire fraud charges were based. The government asserts that Clay held himself out to be a legitimate contractor and

allowed Nealy to use his contractor's license to bill homeowners for repairs that were never completed.

We agree that the government's evidence that Clay fraudulently obtained his contractor's license helped "complete the story" of how he and his co-defendants allegedly committed wire fraud. The district court had a reasonable basis to admit this intrinsic evidence because Clay held himself out to be a legitimate contractor and used the license as part of the conspiracy. Thus, this evidence provided context for the charged offenses. The district court did not abuse its discretion in admitting this testimony. *See United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006) (reviewing a district court's admission of evidence for an abuse of discretion).

## VI. Exclusion of Evidence

Clay argues the government sought an indictment against him for these offenses because of the original prosecutor's animosity toward him, and that the district court should have allowed him to present evidence of this vindictive prosecution to the jury.

The Eighth Circuit has not addressed whether claims of prosecutorial vindictiveness should be addressed at trial. But other circuits have held that this issue should be addressed before trial. *See United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 446 (2006) ("[T]he district court's motion *in limine* was correct because the defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury."); *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973) ("By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law delivered by the court. The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution.").

We agree that the selective prosecution of a criminal defendant is not an issue for the jury to decide. Rather, the district court should consider the matter before trial.

We review the district court's factual findings on a claim of prosecutorial vindictiveness for clear error. *See United States v. Leathers*, 354 F.3d 955, 962 (8th Cir. 2004). After holding a hearing on Clay's selective prosecution claim, the district court concluded the government had not engaged in selective prosecution. In reaching this conclusion, the district court relied heavily on the testimony of the original prosecutor and the prosecutor's supervisor who both testified that they bore no animus toward Clay.

The district court also found that the manner in which this case began indicated that the prosecutor did not retaliate against Clay. This case began when Kenny Wright, a tax preparer, became concerned that he might face criminal charges because of his work for the conspirators. As a result of his concerns, Wright approached the government to discuss the case and implicated all three men. These facts indicate that the prosecutor did not "drum up" these charges against Clay; rather, a person involved in the offense came forward to admit his wrongdoing.

The district court further found that the progression of this case also illustrated that the prosecutor did not engage in vindictive prosecution. The FBI agent testified that for several months he contacted this prosecutor to have the warrant reviewed, and the prosecutor stated he did not have time to review it. The case was then reassigned to a different prosecutor who eventually approved the affidavit. We agree with the district court's reasoning "[t]hat [the fact that the prosecutor] did not take the time to review the affidavit for the search warrant is wholly inconsistent with Clay's theory that [the prosecutor] was hell-bent on revenge."

Upon careful review, we are convinced that the district court adequately considered Clay's claim of selective prosecution pre-trial and its factual findings are not clearly erroneous.

## VII.  Motion to Suppress

The search warrant for Clay's offices relied on an FBI agent's affidavit regarding statements made by tax preparer, Kenny Wright.  Clay argues that the affidavit in support of the search warrant lacked reliable and corroborated information. "We review the district court's factual determinations in support of its denial of a motion to suppress for clear error and its legal conclusions de novo."  *United States v. Alexander*, 574 F.3d 484, 488 (8th Cir. 2009) (quotations and citations omitted).

The district court concluded that the warrant affidavit demonstrated Wright's veracity, and the magistrate judge correctly relied on Wright's information to find probable cause. The court found reliable Wright's statements that Nealy and McCuien solicited individuals to purchase homes, fraudulent construction invoices were prepared for Clay Construction which claimed that the work had been performed, and, at closing, checks were issued to Clay Construction even though no work had been performed.  The court found Wright sufficiently reliable because he had met with FBI agents on three occasions, and he gave the agents Clay's social security number, two pay stubs, and lists of information Nealy had given him to prepare the false returns. The court reasoned that the FBI agents had a sufficient opportunity to assess Wright's credibility during the three meetings, and that the warrant demonstrated Wright's knowledge.

The district court also found that the FBI agent corroborated Wright's statements.  The agent requested Clay and Nealy's tax return records for the previous three years and learned through the Secretary of State's website that Clay's corporate licenses had been revoked for failing to pay taxes.  The agent then took an undercover

agent to Nealy's office and recorded conversations. Based on this information, the agent prepared an affidavit in support of the search warrant, and the magistrate judge issued the warrant.

The FBI agent's investigation sufficiently corroborated Wright's information. *See United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). Therefore, the district court did not err in denying Clay's motion to suppress because the issuing judge had a substantial basis for concluding that probable cause existed.

## VIII. Conclusion

We affirm the judgment of the district court.

_____