# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3802

_____

United States of America

*Plaintiff - Appellee*

v.

Alpha Rashidi Mshihiri

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 19, 2015
Filed: March 14, 2016

_____

Before WOLLMAN, BEAM, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Alpha Rashidi Mshihiri was convicted of one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349; three counts of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2; one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; and one count of wire fraud, in violation of 18 U.S.C. §§ 1343

and 2.  The district court[1] sentenced Mshihiri to 150 months' imprisonment and ordered him to pay restitution in the amount of $1,971,091.91.  We affirm.

## I.  General Background

Mshihiri has a bachelor's degree and had worked as a business analyst for a large national bank, servicing a no-money-down mortgage product.  In 2003 or 2004, Mshihiri founded a mortgage company named GWP Mortgage (GWP), at which he served as president and chief executive officer.  He became a licensed mortgage broker in Minnesota in 2005.

At GWP, Mshihiri supervised the processing of loan applications; he was also responsible for compliance with state and federal law; he formed GWP's policies, directed its initiatives, and managed its day-to-day operations.  In October 2007, GWP went out of business and filed for bankruptcy.  Its operations, however, carried on through two successor companies, Pristine Home Loans (Pristine) and Pristine Finance.  Pristine was located in the building where GWP had operated, and it employed many of the individuals who had worked for GWP.  Mshihiri identified himself as a consultant to Pristine and as CEO of Pristine Finance.  Mshihiri also formed Kilimanjaro Investment Group (KIG), which bought and resold foreclosed properties, and a company called VANY, which was also used in real estate transactions.  As explained more fully below, Mshihiri used these companies in an elaborate mortgage fraud scheme.

In July 2013, a grand jury returned an indictment charging Mshihiri with the counts set forth above.  The indictment alleged that Mshihiri had engaged in a scheme to defraud mortgage lenders from June 2006 through April 2009.  Specifically, the

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

scheme involved obtaining funds from financial institutions by recruiting straw buyers to participate in the purchase of residential properties and submitting false information and documentation in support of their mortgage applications. The indictment identified four properties involved in the scheme: a penthouse condominium in Bloomington, Minnesota (the Penthouse); a duplex in Minneapolis, Minnesota (the Inglewood Duplex); a single-family home in Minneapolis (the 33rd Street Property); and Mshihiri's own single-family home in Independence, Minnesota (the Broadmoor Residence). With inflated purchase prices and, in most cases, sales by a co-conspirator to a straw buyer, Mshihiri and others derived profits from the sales of the properties. Recruiters, brokers, loan officers, and others were paid kickbacks for their roles in the scheme.

Mshihiri has raised several arguments on appeal. He contends that the district court should have suppressed evidence seized pursuant to a warrant, as well as evidence of statements that he made to federal agents. He also argues that the government failed to prove a single conspiracy and that the evidence instead established multiple transactions or conspiracies. He contends that the district court should have suppressed his pretrial and in-court identification by a witness. Finally, he claims that the district court made factual errors in determining his sentence. We address each argument in turn, recounting additional facts as necessary.

## II. Motion to Suppress Evidence

After Mshihiri became a suspect in a mortgage fraud investigation, federal agents applied for warrants to search the Broadmoor Residence, Mshihiri's laptop computer, and his electronic storage devices. Internal Revenue Service Special Agent Jim Shoup submitted an affidavit in support of the warrants, stating that he had interviewed a confidential reliable informant (CRI) on several occasions and that the CRI had implicated himself and Mshihiri in fraudulent conduct. The affidavit set forth specific acts completed by the CRI in furtherance of the mortgage fraud

conspiracy, explaining that the CRI knew of Mshihiri's fraudulent conduct "because CRI #1 committed fraud with . . . Mshihiri." Shoup also stated that he had reviewed loan records, real estate purchase records, bank records, and state charging documents that indicated that Mshihiri was involved in fraudulent conduct. Shoup attested that the CRI had identified another individual, Oluwaleye Oluwatula, who had assisted Mshihiri in fraudulent acts. When interviewed by Shoup, Oluwatula admitted that he had worked with Mshihiri to obtain fraudulent mortgage loans. The applications for the search warrants were granted, and agents searched the Broadmoor Residence on June 30, 2010, while Mshihiri was traveling abroad.

On September 16, 2010, Shoup and United States Secret Service Special Agent Michael Olson coordinated with Customs and Border Protection (Customs) officers to interview Mshihiri and to execute a search of his laptop upon Mshihiri's return from Dar es Salaam, Tanzania. Accordingly, when Mshihiri arrived at the Minneapolis-St. Paul International Airport, a Customs officer intercepted him at the immigration entry point, led him to baggage claim, and then escorted him to a reception area.

According to Olson, he and Shoup met Mshihiri in the reception area, where they identified themselves as federal agents and presented their credentials. They asked whether Mshihiri would be willing to speak with them, explaining that Mshihiri was not under arrest or obligated to answer questions. Olson testified that Mshihiri agreed to be interviewed and voluntarily accompanied them to an interview room. The agents entered the room first and sat at a table across from Mshihiri, who sat "right next to the door." The agents were wearing casual clothes, and Olson testified that if he was wearing his service weapon, it would have been concealed. According to Olson, no Customs officer was present during the interview.

Olson described Mshihiri's demeanor as calm, inquisitive, and alert. Using a normal tone and volume, Shoup asked Mshihiri several questions about the suspected

mortgage fraud, including whether Mshihiri's wife was involved. Mshihiri also asked questions, trying to understand the purpose of the investigation. Olson testified that during the forty-minute interview, Mshihiri did not request a break or try to access his cell phone. He also did not ask to consult a lawyer or ask to call his wife so that she could call a lawyer on his behalf. Olson testified that "[i]f [Mshihiri] would have asked for a lawyer, we wouldn't have questioned him."

Shoup ended the interview abruptly, after changing the tone of his voice and accusing Mshihiri of lying. Shoup gave Mshihiri a copy of the search warrant and advised him that the U.S. Attorney's office had issued a target letter for him. Olson could not remember whether Mshihiri's laptop was searched at the beginning or the end of the interview, but he testified that he and Shoup searched Mshihiri's person after the interview ended. Olson testified that he and Shoup then left the airport and that Mshihiri probably "went out the normal way, back out through the passport control area in the main terminal."

According to Mshihiri, a Customs officer escorted him to an interview room, where he met Olson and Shoup. Mshihiri testified that he was exhausted from his travels and the time difference. When Mshihiri asked to call his wife, the Customs officer seized his cell phone, and thereafter told him, "You need to cooperate; otherwise, your Immigration status is going to be compromised." Mshihiri claimed that the agents disregarded his request for an attorney and his request to call his wife so that she could contact an attorney. As the interview continued, Shoup threatened Mshihiri and his wife, saying that they were "going down" and that they should make arrangements for their children. The Customs officer looked inside the interview room numerous times during the interview. Mshihiri testified that he was never told he was free to leave and that he answered the agents' questions because he "didn't have a choice" and "it felt like [he] couldn't get out of that room."

-5-

Mshihiri moved to suppress the evidence seized as a result of the search warrants and the statements he made during the September 16, 2010, interview. He argued that the affidavit in support of the search warrants was insufficient to establish probable cause, that the interview constituted a custodial interrogation during which he was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and that the statements he made during the interview were not voluntary. Adopting the report and recommendation of the magistrate judge,[2] the district court denied the motion.

Mshihiri first argues that the affidavit in support of the search warrant was insufficient to establish probable cause because the affidavit wrongly identified the CRI as a confidential reliable informant. According to Mshihiri, the CRI should have been identified as a cooperating witness, and the CRI's misidentification prevented the issuing judge from making a fair probable cause determination. "As a reviewing court, we pay 'great deference' to the probable cause determinations of the issuing judge or magistrate, and our inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." United States v. Lucca, 377 F.3d 927, 933 (8th Cir. 2004) (quoting Illinois v. Gates, 462 U.S. 213, 236 (1983)). An issuing judge considers two factors when considering a confidential informant's information: the informant's reliability and the basis for the informant's knowledge. Id. Both factors, however, need not be present before a warrant may issue. Id. The issuing judge considers the totality of the circumstances so that "a deficiency in one [factor] may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." Gates, 462 U.S. at 233.

The information provided by the CRI was sufficiently reliable to support a finding of probable cause, regardless of manner in which he was identified. The CRI

[2]The Honorable Jeffrey J. Keyes, United States Magistrate Judge for the District of Minnesota.

-6-

participated in the mortgage fraud conspiracy with Mshihiri, giving the CRI first-hand knowledge of Mshihiri's role in the scheme. The information the CRI provided also was corroborated by other evidence, including loan records, real estate purchase records, bank records, and state charging documents. Any deficiency in the showing of the CRI's reliability was sufficiently compensated for by the strong showing of the basis of the CRI's knowledge and by the corroborating evidence. Moreover, despite Mshihiri's argument to the contrary, the information contained in the affidavit linked Mshihiri to specific fraudulent mortgage loan transactions and provided a substantial basis for the issuing judge to conclude that probable cause existed.

Mshihiri next argues that the district court should have suppressed the statements he made to Olson and Shoup because he was in custody when he made the statements and he had not been advised of his Miranda rights. "Miranda requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody." United States v. New, 491 F.3d 369, 373 (8th Cir. 2007). To determine whether a person is in custody we consider: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see also United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (listing six non-exclusive factors for evaluating whether an individual is in custody for purposes of Miranda). We review the district court's custody determination *de novo* and its factual findings for clear error. United States v. LeBrun, 363 F.3d 715, 719 (8th Cir. 2004) (en banc).

The district court made the following findings with respect to the circumstances surrounding the interrogation: the agents informed Mshihiri that he was not under arrest, Mshihiri entered the interview room voluntarily and was seated closest to the door throughout the questioning, the agents were dressed in casual

clothing and did not display their weapons, most of the forty-minute interview was calm and conversational, and Mshihiri was never handcuffed or placed under arrest. Because these findings are not clearly erroneous and are well-supported by Olson's testimony, we conclude that Mshihiri was not in custody at any point during the September 16, 2010, interview.

Mshihiri essentially argues that the district court erred in its credibility findings when it rejected his testimony that the agents never told him he was free to leave, that they ignored his request for an attorney, and that they threatened his wife and children. "The district court, however, has a distinct advantage in evaluating the credibility of witnesses, and its credibility determinations are virtually unreviewable on appeal." United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011) (internal quotation marks and citation omitted). The district court reasonably found that Olson's testimony was credible and that Mshihiri's testimony was inconsistent and lacked credibility.

Mshihiri also argues that his statements were not voluntary because the agents threatened his wife and children. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724 (internal quotation marks and citation omitted). Having already concluded that the district court reasonably discredited Mshihiri's testimony that he was threatened by the agents, Mshihiri's argument fails. See id. ("We review the district court's findings of fact for clear error and its legal conclusion as to whether a [statement] was voluntary de novo.").

## III. Conspiracy Conviction

Mshihiri argues that the government failed to prove a single conspiracy involving the four properties identified in the indictment. "Whether the government's

proof established a single conspiracy or multiple conspiracies is a question of fact for the jury." United States v. Morales, 113 F.3d 116, 118 (8th Cir. 1997). Accordingly, we view the evidence in the light most favorable to the verdict and draw all reasonable inferences in favor of the verdict. Id. at 118-19. We recount in some detail the facts related to each property below, keeping in mind our deferential standard of review.

## A. Factual Background

In 2007, Mshihiri lived with his wife, Yvrose Mshihiri (Yvrose), and their children at the Broadmoor Residence, an expansive home situated on a large lot in Independence, Minnesota. According to Mshihiri, they planned to move to Tanzania to pursue business opportunities there, and so he and Yvrose decided to sell the Broadmoor Residence and purchase the Penthouse, as a place where they could stay when they visited the United States.

The April 2007 purchase agreement for the Penthouse stated a purchase price of $1,090,000 and listed only Yvrose as the buyer. Mshihiri and his broker had negotiated a deal with the sellers that inflated the purchase price of the Penthouse to facilitate post-closing kickbacks. The seller testified that he had "agreed to distribute checks after the closing from the funds of the sale to entities of Alpha [Mshihiri's] choosing." The broker and an associate of Mshihiri provided funds for the down payment. Mshihiri testified that he and Yvrose did not plan on living in the Penthouse immediately after they purchased it.

Mshihiri provided the information and documentation used to complete the loan application. The application falsely stated that Yvrose earned $27,000 per month as an owner of VANY. It indicated that no part of the down payment was borrowed, that Yvrose planned to occupy the Penthouse after closing, and that Yvrose's primary residence was a home she rented in Brooklyn Center, Minnesota.

The application did not disclose Yvrose's obligation on the mortgage on the Broadmoor Residence. The application included a bank statement that had been altered to remove Mshihiri's name from the account and to show Yvrose's address as being in Brooklyn Center. It also included a false investment account statement. Mshihiri ultimately secured two loans, together totaling more than $987,000.

The sale of the Penthouse closed on June 26, 2007. After the seller's mortgage on the Penthouse was paid, the broker received $87,200 and the seller received $284,327.43. From her proceeds, the broker paid $40,750 to VANY. The seller testified that Mshihiri instructed him to make four payments from his proceeds, which he did. The seller paid $20,000 to the broker; $77,000 to the associate who helped fund the down payment; $40,000 to another associate of Mshihiri; and $69,000 to KIG. Mshihiri stopped making payments on the mortgage shortly after closing. The Penthouse went into foreclosure and was sold at a sheriff's sale in July 2008.

KIG's bank account had a negative balance when the proceeds from the Penthouse transaction were deposited. The day after the $69,000 was deposited, KIG used part of those funds to make a mortgage payment on the Inglewood Duplex, a residential property in Minneapolis that John Mlay had purchased using funds from Mshihiri and other members of KIG. The co-founder of KIG described Mlay as an associate whose name and credit KIG used to buy properties. KIG, however, made the mortgage payments on the Inglewood Duplex.

Okwuchwukwu Jidofor (KeKe)[3] recruited Yartah Kimba to purchase the Inglewood Duplex from Mlay. Kimba was a hair stylist who had her own salon, which was located in a space that she leased. She met KeKe at a nightclub, and KeKe

---

[3]KeKe joined the conspiracy after going to GWP's office looking for work. Mshihiri told him that he could make thousands of dollars by recruiting straw buyers to purchase houses and could, in turn, pay the buyers whatever he wished from his share of the proceeds.

convinced her to buy property through him, even though she had limited income and no significant assets. KeKe obtained Kimba's personal and financial information and brought it to Mshihiri. Mshihiri assured KeKe that the deal would proceed, despite the fact that Kimba did not have sufficient assets to qualify for a loan. On November 13, 2007, Kimba entered into an agreement to purchase the Inglewood Duplex.

Mshihiri handled the documentation for Kimba's loan. He gave the documents to KeKe, who took them to Kimba to sign and then returned them to Mshihiri's office. Kimba's loan application falsely stated that she earned $5,229 per month as a general manager of a tax preparation service provider, that she had more than $15,000 in cash, and that no part of the down payment had been borrowed. Mshihiri instructed KeKe to take the completed application to Yissa Jinadu, a loan officer for Wells Fargo. A loan of more than $265,000 was secured.

The sale of the Inglewood Duplex to Kimba closed on December 26, 2007. After Mlay's existing mortgage was paid, KIG received $93,250.17 and paid $55,000 to the company that had supplied the funds for Kimba's down payment. At Mshihiri's direction, that company, in turn, paid kickbacks in the amounts of $2,000 to Mlay; $21,971.03 to KeKe; and $3,000 to Jinadu.

Some mortgage payments were made on the Inglewood Duplex by the co-founder of KIG. Kimba, however, was surprised by the size of the mortgage and by the uninhabitable state of the Inglewood Duplex. She could not afford to make the necessary repairs or the mortgage payments, and the Inglewood Duplex went into foreclosure.

Mshihiri used $30,000 of KIG's funds from the Inglewood Duplex sale to purchase the 33rd Street Property, which he later transferred to his company VANY, recording a $60,000 mortgage to KIG. Sometime thereafter, KeKe told Mshihiri about a stolen identity that KeKe had acquired from a friend, and Mshihiri decided

-11-

to use it to purchase the 33rd Street Property from VANY. On July 2, 2008, Mshihiri and KeKe went to an Associated Bank together, where KeKe opened an account in the identity-theft victim's name, R.C. After Mshihiri told KeKe that they would need someone to pose as R.C., KeKe recruited Tristan Trice to the scheme. A loan in R.C.'s name was brokered through Pristine. Given that R.C.'s identity had been stolen, the loan application was entirely fabricated and supported by fraudulent documentation.

On July 21, 2008, Trice signed the closing documents for the 33rd Street Property as R.C., but it was too late in the day for Trice to purchase the cashier's checks required for closing. Accordingly, the next day, KeKe and Trice went to an Associated Bank, where Trice was able to purchase a $6,000 cashier's check as R.C., using cash given to him by KeKe. KeKe and Trice then went to an office building in Brooklyn Park, Minnesota, where they met Mshihiri, who had cash for a second cashier's check. Driving a black Mercedes bearing personalized license plates, Mshihiri took KeKe and Trice to an Associated Bank in St. Louis Park, Minnesota, where Mshihiri gave Trice an envelope containing cash and instructed him to purchase a $5,000 cashier's check. Mshihiri and KeKe waited in the parking lot while Trice entered the bank to complete the transaction. Trice presented the cash and a withdrawal slip to the teller in an attempt to purchase the cashier's check. Their suspicions aroused, bank personnel called the police, who arrested Trice. As he was being escorted out of the bank, Trice saw Mshihiri drive away. Another associate was able to procure a second cashier's check in R.C.'s name later that day. The checks were delivered to the title company, which released funds to VANY on July 23, 2008.

From the $187,493.86 proceeds from the sale of the 33rd Street Property, $60,000 was paid to Pristine and $126,139.51 was paid to VANY. Pristine then transferred its funds to KIG, which in turn used part of the funds to facilitate Hassan Rashid's straw purchase of the Broadmoor Residence. Mshihiri issued kickbacks to

the recruiter, broker, and loan officers from the VANY account, and VANY then transferred $62,500 of its funds to Rashid's bank account.

Mshihiri convinced Rashid, his cousin, to act as the straw buyer of Mshihiri's primary home, the Broadmoor Residence. Mshihiri explained that he was contemplating moving to Tanzania and had not been able to sell his house. He suggested that Rashid purchase the house, with Mshihiri making the down payment and finding renters to cover the monthly mortgage payments. Rashid agreed to do so, but he had no role in setting the purchase price of $640,000, which he believed was arranged by Mshihiri and the loan officer.

Mshihiri completed the loan application, which, as with the applications related to the other properties, was replete with misrepresentations and omissions. The application misrepresented Rashid's income and employer, stating that he earned $14,824 per month working for Pristine Finance. The application also indicated that no part of the down payment was borrowed, that Rashid planned to occupy the Broadmoor Residence after closing, and that Rashid received $2,500 per month in rental income, none of which was true. Phony pay stubs and a false investment account statement were submitted in support of the application. Rashid's loan application was referred to Jinadu, the Wells Fargo loan officer who had facilitated the Inglewood Duplex deal. As recounted above, Mshihiri provided most of Rashid's down payment through KIG and VANY. The sale closed on July 31, 2008, following which Mshihiri and his family continued to live at the Broadmoor Residence, which eventually went into foreclosure.

## B. Discussion

Mshihiri argues that the government failed to prove a single conspiracy. He describes the roles different individuals played in completing the fraudulent transactions related to each of the four properties, arguing that there were four

separate schemes, one for each property. Denying that he was the hub of a single, hub-and-spoke conspiracy, Mshihiri claims that KeKe was the hub of the conspiracies involving the Inglewood Duplex and the 33rd Street Property and that the Penthouse and the Broadmoor Residence were merely "separate personal transactions of Mr. and Mrs. Mshihiri." Appellant's Br. 38. He reiterates the fact that not all of the individuals involved in the four transactions worked together and that he was often traveling outside the country when the transactions related to the Inglewood Duplex and 33rd Street Property were being completed.

"A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement." Morales, 113 F.3d at 118-19 (internal quotation marks and citation omitted). If the evidence has established one overall agreement to commit an illegal act, the government has proved its case. Id. In determining whether the evidence has established a single conspiracy, we consider the totality of the circumstances, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences in favor of the verdict. United States v. Johnson, 719 F.3d 660, 669 (8th Cir. 2013). "Relevant factors include the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." Id. (internal quotation marks and citation omitted). A single conspiracy may exist "even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." Id.

When so viewed the evidence established a single conspiracy, whose purpose was to secure lenders' funds through material misrepresentations, omissions, and fraudulent documents. The manner and means of securing lenders' funds were similar across the transactions related to the four properties. Specifically, Mshihiri or a co-conspirator would identify a straw buyer and a property in the Twin Cities metropolitan area. Thereafter, purchase prices were inflated, the straw buyer's

income and assets were misrepresented, down payment funds were secured, and post-closing kickbacks were paid, usually at Mshihiri's direction. The loan applications bore similar misrepresentations of income and assets, and the documentation supporting each application was altered, fabricated, or created from whole cloth. Mshihiri used GWP, Pristine, KIG, and VANY, and individuals who shared connections to those entities throughout the June 2006 through April 2009 conspiracy.

The flow of the ill-gotten funds used to perpetuate the scheme also supports the jury's finding of a single conspiracy. Proceeds from the Penthouse closing were used to fund mortgage payments on the Inglewood Duplex before it was sold to straw-buyer Kimba. Some of the proceeds from the Inglewood Duplex closing were then used to fund Mshihiri's purchase of the 33rd Street Property before it was sold to the fictitious straw-buyer, R.C. Thereafter, proceeds from the 33rd Street Property closing were used to fund the down payment for Rashid's straw purchase of the Broadmoor Residence.

Finally, we reject Mshihiri's contention that KeKe was the hub of separate conspiracies involving the Inglewood Duplex and the 33rd Street Property. Although KeKe had recruited Kimba and procured a stolen identity, he brought those straw buyers to Mshihiri, who then completed or facilitated the completion of their bogus loan applications, which in turn secured lenders' funds through material misrepresentations and omissions. The overwhelming evidence of his involvement gives the lie to Mshihiri's argument that he was not responsible for these transactions because he was traveling abroad.

IV. Motion To Suppress Trice's Pretrial and In-Court Identification of Mshihiri

Mshihiri argues that evidence of Trice's pretrial identification of Mshihiri should have been suppressed. Before trial, Trice had been shown photographs of

Mshihiri and had identified him on an investigative flow chart, recognizing him as one of the "big guys." It was Mshihiri who introduced the pretrial identification evidence, however, in an attempt to demonstrate to the jury that Trice knew Mshihiri only from the photographs he was shown. By introducing this evidence himself, Mshihiri has waived any argument that the district court should have excluded it. See United States v. Preciado, 336 F.3d 739, 745 (8th Cir. 2003) (citing United States v. Mihm, 13 F.3d 1200, 1204 (8th Cir. 1994) (concluding that an unsuccessful tactical decision waives even plain error review)).

Mshihiri also argues that the district court erred by denying his motion to suppress Trice's in-court identification of Mshihiri. He contends that the pretrial identification procedures were unnecessarily suggestive and tainted Trice's in-court identification, thereby violating Mshihiri's constitutional right to due process. Reviewing this claim *de novo*, we apply the two-part test that governs the admissibility of identification evidence. United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003). "First, we determine if the identification procedures were 'impermissibly suggestive.' If they were, we examine the totality of the circumstances to determine whether the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" Id. (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). In determining the likelihood of misidentification, we consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Id. (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).

Even if we were to assume that the procedure here was somehow impermissibly suggestive, the circumstances do not suggest a substantial likelihood that Trice misidentified Mshihiri. Trice observed Mshihiri twice: when Trice first impersonated R.C., and again approximately a week after their first encounter, when

Mshihiri drove Trice from an office building located in Brooklyn Park to a bank located in St. Louis Park. Trice apparently paid close attention to Mshihiri, because he was able to recount their meetings in detail and accurately describe the make, color, and personalized license plate of Mshihiri's vehicle. According to Mshihiri, when Trice was shown the investigative flow chart more than three years after he had last seen Mshihiri, he identified Mshihiri as one of the "big guys," but later seemed to confuse Oluwatula and Mshihiri. Given the totality of the circumstances, however, we find no substantial likelihood of irreparable misidentification, and thus the district court did not err in allowing Trice to identify Mshihiri at trial.

## V. Sentencing

At sentencing, the government introduced a summary chart showing the losses for thirteen properties that were involved in the overall scheme to defraud—three of the properties that were the subject of the trial and ten other properties.[4] For each property, the chart listed the address, borrower, closing date, lender, financial loss victim, loan amount, unpaid principal balance, sales price, sales proceeds, and realized loss. To calculate the amount of loss, the government took the post-foreclosure sales price or sales proceeds for each property, whichever was higher, and subtracted it from the unpaid principal balance on the fraudulently obtained mortgages, which resulted in a total realized loss of $1,971,091.91. A special agent with the United States Department of Housing and Urban Development (HUD) testified regarding the ten properties that were not identified in the indictment, connecting each property and associated transaction to the conspiracy.

The district court determined that Mshihiri's relevant conduct involved the thirteen properties listed on the summary chart and found that the amount of loss was

---

[4]The 33rd Street Property did not have a realized loss when Mshihiri was sentenced and was not included in the loss calculation.

$1,971,091.91. The district court applied several enhancements to Mshihiri's base offense level: a loss of more than $1 million but not more than $2.5 million; using sophisticated means; making unauthorized use of a means of identification to obtain another means of identification; deriving more than $1 million in gross receipts from one or more financial institutions; acting as an organizer or leader of criminal activity that involved five or more participants; and obstructing justice. The district court rejected Mshihiri's request that the amount of loss be discounted by thirty percent based on unforeseeable market changes. The district court determined that Mshihiri's total offense level was 35, his criminal history category was I, and his advisory sentencing range was 168 to 210 months' imprisonment. As set forth earlier, Mshihiri was sentenced to 150 months' imprisonment and ordered to pay restitution in the amount of $1,971,091.91.

Mshihiri argues that the district court erred in determining his relevant conduct, the actual loss amount, and that Mshihiri had obstructed justice.[5] Mshihiri first argues that the government failed to prove any jointly undertaken criminal activity. He contends that the transactions related to each of the properties described in the indictment were separate frauds and not part of an overarching conspiracy. He also argues that the transactions related to the ten other properties should not be considered relevant conduct.

---

[5]Mshihiri has made no meaningful argument regarding the district court's imposition of offense-level enhancements for use of sophisticated means, use of identification to obtain another means of identification, and role in the offense. Accordingly, he has waived any such argument. See Fed. R. App. P. 28(a)(8)(A) (stating that an appellant's brief should contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); United States v. Ali, 799 F.3d 1008, 1026 (8th Cir. 2015) (foregoing consideration of an argument that was mentioned but not meaningfully argued).

We review the district court's relevant conduct findings for clear error. United States v. Whiting, 522 F.3d 845, 850 (8th Cir. 2008). For sentencing purposes, relevant conduct includes all acts and omissions of the defendant that were "part of the same course of conduct or common scheme or plan as the offense of conviction" and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1) and (2). The district court did not clearly err in finding that Mshihiri's relevant conduct included the properties listed on the summary chart. The properties that were the subject of trial are beyond challenge. As for the remaining ten properties, the HUD special agent's testimony connected those properties to the conspiracy and established that the lenders with respect to those properties were defrauded during the time period alleged in the indictment by means of a scheme substantially similar to the one alleged in the indictment. Mshihiri makes no specific allegations of error as to any of the properties, but argues that he did not fully control the mortgage fraud, that he spent several months abroad between 2007 and 2009, and that he began exiting the real estate business during that time period. Whatever the truth of those assertions, they do not establish that the district court clearly erred in determining Mshihiri's relevant conduct.

Mshihiri contends that the ten properties addressed at sentencing should not have been included in the loss calculations. He further argues that the district court should have considered only the loss suffered by the original lender. If the lender packaged the mortgage and sold it to a different financial institution for a profit, the argument goes, no loss should be attributed to Mshihiri. Finally, he contends that the district court erred when it considered hearsay evidence and when it rejected his so-called black swan argument—that is, that the amount of loss should be reduced by thirty percent to account for the unforeseeable collapse of the real estate market.

The district court did not clearly err in finding an actual loss of $1,971,091.91. United States v. Engelmann, 720 F.3d 1005, 1013 (8th Cir. 2013) (standard of

review). As an initial matter, the district court properly included the losses from the ten properties addressed at sentencing in its loss calculation. See United States v. Quevedo, 654 F.3d 819, 823 (8th Cir. 2011) ("A sentencing court must include in its calculation any losses caused by 'relevant conduct.'"). We have held that a district court does not clearly err "in basing its actual loss calculation on the difference between the unpaid loan balances and the prices obtained for the properties at sheriff's sales or short sales." Engelmann, 720 F.3d at 1013-14 (citing U.S.S.G. § 2B1.1 cmt. n.3(E)(ii)). Accordingly, there can be no clear error here, where the district court engaged in a more conservative calculation by subtracting the higher of the post-foreclosure sales price or the sales proceeds from the unpaid principal balance.

Moreover, the loss here meets the U.S. Sentencing Guidelines Manual's definition of "actual loss" because the loss was "the reasonably foreseeable pecuniary harm that resulted from the offense." See U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (defining "actual loss"). The Guidelines define "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(iv), and we have recognized that "[i]t was reasonably foreseeable 'that a scheme premised on false loan applications and inflated real estate prices would unravel, and that market conditions could exacerbate the losses.'" Engelmann, 720 F.3d at 1014 (quoting United States v. Spencer, 700 F.3d 317, 323 (8th Cir. 2012)). Moreover, it is immaterial that the loss victims were sometimes other than the original lender. Regardless of whether the victim was the original lender or a subsequent holder of the mortgage, the pecuniary harm "resulted from" Mshihiri's conspiracy offense. Finally, the district court did not err in considering the hearsay testimony of the HUD special agent. United States v. Shackelford, 462 F.3d 794, 796 (8th Cir. 2006) (per curiam) ("Hearsay evidence, even double hearsay, can be used at sentencing proceedings if it bears sufficient indicia of reliability to support its probable accuracy." (internal quotation marks and citation omitted)).

With respect to the enhancement for obstruction of justice, the district court found that Mshihiri gave false testimony both at the suppression hearing and at trial. Because "[c]ommitting perjury at trial is a reason to apply a two-level enhancement for obstruction of justice" and because there was no clear error in the finding that Mshihiri had committed perjury, the district court properly applied the enhancement. See United States v. Waters, 799 F.3d 964, 974 (8th Cir. 2015) (citing U.S.S.G. § 3C1.1 cmt. n.4(B)).

Throughout his sentencing arguments, Mshihiri cites Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 133 S. Ct. 2151 (2013). In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In Alleyne, the Court held that any fact that increases the statutory mandatory minimum sentence to which a defendant is exposed is an "element" of the crime and must be submitted to the jury. 133 S. Ct. at 2155. Neither case applies here, because the district court's findings did not increase the statutory maximum sentence or the statutory mandatory minimum sentence.

VI. Conclusion

The judgment is affirmed.

_____

-21-