# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4465

_____

United States of America

*Plaintiff - Appellee*

v.

Edgar Edward Gonzalez

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 20, 2017
Filed: February 1, 2018
[Unpublished]

_____

Before WOLLMAN and SHEPHERD, Circuit Judges, and GOLDBERG,[1] Judge.

_____

PER CURIAM.

In April 2015, Edgar Edward Gonzalez arranged for Florencio Molina-Gonzalez, Juan Carlos Candela, Evelyn Mejia, and Alfonso Ayala, to transport

_____

[1]The Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

approximately twenty-two pounds of methamphetamine from Phoenix, Arizona, to Minneapolis, Minnesota. Police intercepted and arrested the drug couriers near Albert Lea, Minnesota. Subsequent police investigation led the Federal Bureau of Investigation (FBI) to Gonzalez.

Gonzalez pleaded guilty to conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, and was sentenced to 202 months' imprisonment. Gonzalez appeals his sentence, arguing that the district court[2] erred in applying certain enhancements under the United States Sentencing Guidelines (Guidelines or U.S.S.G.) and imposed a substantively unreasonable sentence. We affirm.

Gonzalez argues that the district court erred in applying a 2-level enhancement for using a dangerous weapon under Guidelines § 2D1.1(b)(1) because no firearm was ever found. Under Guidelines § 2D1.1(b)(2) cmt. n.11(A), the dangerous weapon enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." During the sentencing hearing, an FBI agent testified about his conversations with co-conspirator Ayala and Gonzalez's associate Joel Sandoval, in which Ayala said that Gonzalez had given him a 9 mm Sig Sauer handgun to guard methamphetamine that was stored at a house in Arizona. Sandoval told the agent that Gonzalez owned a .38 caliber semi-automatic pistol and a .45 caliber semi-automatic pistol. During a search of the two Minnesota residences that Gonzalez used to process the methamphetamine, law enforcement officers discovered a gun cleaning kit, a box of 9 mm ammunition, a gun magazine with 9 mm rounds, and a Sig Sauer handgun case. The FBI obtained a Facebook picture of Gonzalez—taken during the dates alleged in the superseding indictment—that depicted him with a semi-automatic pistol tucked into his belt. The

---

[2]The Honorable Donovan W. Frank, United States District Court for the District of Minnesota.

physical evidence and the statements by the co-conspirators established that Gonzalez possessed at least one firearm during the conspiracy and that it was not clearly improbable that the firearm was connected to the methamphetamine conspiracy.

Gonzalez also argues that the district court erred in applying the "stash house" enhancement by not adequately explaining the basis for its decision. A defendant receives a 2-level enhancement under Guidelines § 2D1.1(b)(12) if he "maintained a premises for the purpose of manufacturing or distributing a controlled substance." The Guidelines explain that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1 cmt. n.17. The Guidelines instruct the district court to "consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." Id. The FBI agent testified during the sentencing hearing that the co-conspirators confirmed that Gonzalez used two residences in Minneapolis to receive, store, package, and distribute methamphetamine. The agent further testified that Gonzalez stayed at one of the residences only "when the drug loads came in." We conclude that although the district court's explanation for its decision might well have been more thorough, it was entitled to rely on the foregoing testimony in imposing the enhancement and that no further explanation was required.

Next, Gonzalez challenges a 3-level enhancement for managing or supervising criminal activity under Guidelines § 3B1.1(b). Gonzalez argues that because co-conspirator and co-defendant Sandoval did not receive such an enhancement for his role in the offense, Gonzalez likewise should not have received it. During the sentencing hearing, however, the FBI agent testified that Gonzalez "had control over Sandoval" and that Gonzalez was in charge of the entire operation. The district court acknowledged that while Sandoval was more culpable than the defendants other than

Gonzalez, it found that Gonzalez's role in the conspiracy was even more extensive, which constituted a legitimate distinction between the two, and thus no unwarranted disparity resulted.

Gonzalez further argues that the district court's sentencing decision was affected by psychological bias, pointing to the district court's observation that the co-conspirators in this case were "more terrified and scared than most that I have seen when they were testifying on what might happen to them." Gonzalez alleges that this statement finds no support in the record and thus reflects a subjectivity against which there is no way to defend. Gonzalez describes the district court as having "engaged in what is referred to in the social science literature as 'judgment by representativeness,' a phrase coined by none other than Daniel Kahneman & Amos Tversky" in their article "*On the Reality of Cognitive Illusions*," 103 Psychology Review 582, 582 (1996). Gonzalez argues that the district court's assumption of the fear caused by Gonzalez's conduct—a "representativeness" in Gonzalez's view—may well have been caused by other reasons, e.g., in-court nervousness or embarrassment. This is an interesting, thought-provoking argument, but it does not carry the day, for ultimately a district court's evaluation of a witness's emotional state, whether expressed by words, physical conduct, or demeanor, should be given the same deference that we give to its determinations of a witness's credibility. See United States v. Mshihiri, 816 F.3d 997, 1004 (8th Cir. 2016) (stating in the context of a suppression motion that "[t]he district court . . . has a distinct advantage in evaluating the credibility of witnesses, and its credibility determinations are virtually unreviewable on appeal") (quoting United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011) (internal quotation marks omitted)). This is not to say, of course, that all judges, trial and appellate alike, should not strive to set aside preconceptions, unwarranted assumptions, and the like in performing their respective roles.

Lastly, Gonzalez argues that his sentence is substantively unreasonable because the methamphetamine Guidelines lack an empirical basis. Gonzalez argues that a

district court is not required to impose Guidelines range sentences when it has a policy disagreement with the Guidelines, citing United States v. Hayes, 948 F. Supp. 2d 1009, 1014 (N.D. Iowa 2013) (citing Spears v. United States, 555 U.S. 261, 263-67 (2009) (*per curiam*); Kimbrough v. United States, 552 U.S. 85, 109-10 (2007)). True enough, but as we have explained, "while a district court may choose to deviate from the guidelines because of a policy disagreement, a district court is not required to do so." United States v. Manning, 738 F.3d 937, 947 (8th Cir. 2014) (internal citations and quotation marks omitted). Given the extensive nature of Gonzalez's involvement and his management role in this drug distribution conspiracy, we conclude that his below-Guidelines sentence is not substantively unreasonable.

The sentence is affirmed.

_____